2012-1644

---

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

IA LABS CA, LLC,

Plaintiff-Appellant,

v.

NINTENDO CO., LTD. and NINTENDO OF AMERICA INC.,

Defendants-Appellees.

---

Appeal from the United States District Court for the
District of Maryland in Case No. 10-CV-0833, Judge Peter J. Messitte

---

**NON-CONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLEES
NINTENDO CO., LTD. AND NINTENDO OF AMERICA INC.**

---

Jerry A. Riedinger
Tyler C. Peterson
Kirstin E. Larson
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000

C. Mark Kittredge
PERKINS COIE LLP
2901 N. Central Ave., Suite 2000
Phoenix, AZ  85012-2788
Telephone:  602.351.8000
Facsimile:  602.648.7000


Attorneys for Defendants-Appellees

January 18, 2013

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellees Nintendo Co., Ltd., and Nintendo of America Inc., certify the following:

1.     The full name of every party or amicus represented by me is:

     Nintendo Co., Ltd., and Nintendo of America Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

     The parties named in the caption, Nintendo Co., Ltd., and Nintendo of America Inc., are the real parties in interest.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     Nintendo Co., Ltd., has no parent corporation.  Its stock is publicly traded in Japan, and no publicly held corporation currently owns 10% or more of that stock.  Nintendo of America Inc. is a wholly-owned subsidiary of Nintendo Co., Ltd.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

     Attorneys who appeared in the trial court:

     <u>Perkins Coie LLP</u>
     Jerry A. Riedinger, Tyler C. Peterson, Jessica L. Rossman, Stevan Stark, Vincent A. Singh, Terrence J. Wikberg, C. Mark Kittredge

Rifkin, Livingston, Levitan & Silver, LLC
M. Celeste Bruce

Nixon & Vanderhye, P.C.
Joseph A. Rhoa, Gordon P. Klancnik, Robert W. Faris,
Michael J. Shea, Michael E. Crawford


Dated:  January 18, 2013          /s/ Jerry A. Riedinger
                                        Jerry A. Riedinger

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ............................................................... vii

RELATED CASES ...............................................................................x

I.  INTRODUCTION ........................................................................1

II.  ISSUES PRESENTED FOR REVIEW ......................................2

III.  STATEMENT OF THE CASE .....................................................3

IV.  STATEMENT OF FACTS ............................................................5

    A.  The Invention Requires An "Effector" that
       "Provides" Isometric Exercise ...........................................5

        1.  The Invention of the '982 Patent ..............................6

        2.  The Wii Balance Board Detects a User's
            Body Motion ........................................................11

        3.  The District Court's Determination of
            Noninfringement ..................................................16

            a.  IA Labs' Theory that the Balance
                Board Detects More Than Weight
                Shifts ............................................................16

            b.  The District Court's Discussion of the
                "Provides" Limitation...................................19

            c.  The District Court's Discussion of the
                "In Accordance with" Limitation .................21

            d.  The District Court's Construction that
                "Isometric Exercise" Requires the
                User to Strain Against an Effector,
                Not Against Herself ......................................22

**TABLE OF CONTENTS**
**(continued)**

Page

B.    The District Court's Exceptional Case Finding and Fee Award Based on IA Labs' Assertion of the Invalid '226 Patent ............................................................23

1.    The Claimed Invention of the '226 Patent................................24

2.    The '226 Patent's Invalidity Under 35 U.S.C. § 102(b) ........................................................26

3.    IA Labs' Knowledge of Invalidity of the '226 Patent When it Sued Nintendo and Its Disclaimer After Nintendo Confronted it With the Evidence of Invalidity................................28

4.    The District Court's Exceptional Case Finding and Fee Award........................................30

V.    SUMMARY OF THE ARGUMENT ...........................................32

VI.    ARGUMENT.................................................................................33

A.    No Reasonable Jury Could Find Infringement on the Facts of Record..............................................................33

1.    No Reasonable Jury Could Find that the Balance Board "Provides" Isometric Exercise ..........................................................34

2.    The Enoka Reference is Irrelevant to Non-Infringement...................................................39

3.    Dr. Phillips' Opinion Does Not Support IA Labs' Theory .........................................................40

4.    No Reasonable Jury Could Find that the Balance Board Controls Games "in Accordance with" Isometric Exercise.....................................42

# TABLE OF CONTENTS
## (continued)

Page

B.    The District Court Correctly Construed "Isometric Exercise" ................................................................45

    1.    The District Court's Construction of "Isometric Exercise" Was Not Ambiguous or Uncertain..............................................................46

    2.    The Effector, Not the User's Body, "Provides" Isometric Exercise ...............................47

        a.    The Claim Language Confirms that the "Effector," Not the User's Body, is the Object that Significantly Resists Movement ...........................................................47

        b.    The District Court's Construction Aligns With the Specification, Including the '982 Patent's Express Definition of "Isometric Exercise"................................48

        c.    IA Labs' Focus on Extrinsic Evidence is Misplaced ....................................................51

    3.    The "Sensor" is Responsive to Forces Applied to Perform Isometric Exercise, Not Weight and Weight Shifting ...................................53

C.    The District Court's Fee Award was Appropriate Because IA Labs Filed and Maintained Objectively Baseless Claims of Infringement.........................................55

    1.    Fee Awards are Proper When a Patentee Brings an Objectively Baseless Infringement Claim in Bad Faith ...................................................56

# TABLE OF CONTENTS
## (continued)

Page

2.    Overwhelming Evidence Supported the District Court's Findings that the '226 Patent was Invalid and that IA Labs' Principals Knew of the Facts Causing Invalidity ..................................................................................57

3.    The District Court Properly Considered and Rejected IA Labs' Only Argument for Validity:  That the Commercial Embodiment Did Not Practice the "Tube Inside A Tube" Claim Limitation ....................................................................59

4.    IA Labs' Contention that the District Court Ignored the Presumption of Validity is Wrong........................................................................................61

VII.   CONCLUSION............................................................................63

## CONFIDENTIAL MATERIAL OMITTED

The material redacted from this brief is subject to a protective order.  The material omitted on page 28 is a quote from an Interaction Laboratories, Inc. ("Interaction") business plan that IA Labs designated "Confidential" under the protective order.  Also omitted from page 28 is a description of Interaction purchase orders that IA Labs designated "Confidential" under the protective order.  The material omitted from page 29 is a quote of deposition testimony by Mr. Gregory Merril that IA Labs designated "Confidential" under the protective order.

# TABLE OF AUTHORITIES

**Page**

C<small>ASES</small>

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)....................................................................37

*Arthur A. Collins, Inc., v. N. Telecom, Ltd.*,
  216 F.3d 1042 (Fed. Cir. 2000) ..............................................18, 37

*Concordance Corp. v. Amazon.com, Inc.*,
  658 F.3d 1330 (Fed. Cir. 2011) ..................................................60

*Cybor Corp. v. FAS Techs., Inc.*,
  138 F. 3d 1448 (Fed. Cir. 1998) .................................................56

*Daubert v. Merrel Dow Pharm., Inc.*,
  509 U.S 579 (1993)......................................................................38

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004) ..................................................37

*Eltech Sys. Corp. v. PPG Indus., Inc.*,
  903 F.2d 805 (Fed. Cir. 1990) ....................................................57

*Eon-Net LP v. Flagstar Bancorp.*,
  653 F.3d 1314 (Fed. Cir. 2011) ..................................................56

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997)....................................................................38

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  No. 2011-129, 2012 WL 6054758 (Fed. Cir. Dec. 6, 2012) ............56

*Hughes v. Novi Am., Inc.*,
  724 F.2d 122 (Fed. Cir. 1984) ....................................................58

*Intellectual Sci. & Tech., Inc. v. Sony Elec., Inc.*,
  589 F. 3d 1179 (Fed. Cir. 2009) ..............................................18, 37

*Invitrogen Corp. v. Clonetech Labs., Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005) ....................................................................36, 37

*K-TEC, Inc. v. Vita-Mix Corp.*,
    696 F.3d 1364 (Fed. Cir. 2012) ........................................................................37

*Markman v. Westview Instruments Inc.*,
    52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)...................................49

*Netword, LLC v. Centraal Corp.*,
    242 F.3d 1347 (Fed. Cir. 2001) ........................................................................33

*Novartis Corp. v. Ben Venue Labs., Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001) .............................................................18, 37, 38

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*,
    157 F.3d 866 (Fed. Cir. 1998) ...........................................................................37

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ......................................................47, 48, 49, 51

*Stephens v. Tech Int'l, Inc.*,
    393 F.3d 1269 (Fed. Cir. 2004) ........................................................................57

*Techsearch, L.L.C. v. Intel Corp.*,
    286 F3d 1360 (Fed. Cir. 2002) .........................................................................33

*Tokai Corp. v. Easton Enter., Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011) ........................................................................45

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ..........................................................................51

*W.L. Gore & Assocs., Inc. v. Oak Materials Grp., Inc.*,
    424 F. Supp. 700 (D. Del. 1976)..................................................................62, 63

## STATUTES

35 U.S.C. § 102(b) .....................................................................................26, 31, 58

35 U.S.C. § 285..............................................................................................passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 .................................................................................................37

Fed. R. Civ. P. 56(c)............................................................................................44

Federal Circuit Rule 28(b) ....................................................................................3

## <u>RELATED CASES</u>

Counsel is not aware of any other appeal in or from the civil action in the district court that has previously been before this or any other appellate court.

Counsel is aware of a civil action pending in Maryland State court, *Nintendo Co., Ltd. et al., v. IA Labs CA, LLC*, Circuit Court for Montgomery County, MD, Civil Action No. 367579-V. That action is in aid of enforcement of the fee award in this case. Counsel is also aware of an inter partes reexamination of the '982 patent. Request No. 95/001,460 was filed on October 1, 2010 and was granted on November 18, 2010. The PTO issued a final action affirming the patentability of all claims on April 11, 2011. That decision is on appeal to the Patent Trial and Appeal Board.

## I.    INTRODUCTION

IA Labs' brief focuses on construction of the phrase "isometric exercise." Yet this Court need not reach that issue to affirm, because no reasonable juror could find infringement even under IA Labs' construction. Every claim requires an "effector" that will "provide" isometric exercise, but nothing in Nintendo's accused products can even detect isometric exercise, so Nintendo's products cannot reasonably meet that limitation. IA Labs' arguments to the contrary defy fundamental laws of physics, and pretend that "weight" is "muscle force." Every claim also requires that the accused system control a virtual reality scenario "in accordance with performance of … isometric exercise," yet the Nintendo products control games through detecting weight shifts. IA Labs presented no evidence showing that Nintendo's game software uses isometric exercise (however defined) to control any game.

The district court's construction of "isometric exercise" is nevertheless correct: the claim language and specification of the '982 patent confirm that, in the claimed invention, a user exerts muscle force against an "effector," not against herself. That construction further confirms noninfringement.

Finally, the district court did not err, much less clearly err, in ruling that IA Labs' assertion of the '226 patent rendered the case exceptional, justifying an award of attorney fees. No reasonable person would have considered the patent

valid, knowing, as IA Labs' principals did, that the invention was on sale and publicly used more than a year before the filing date. IA Labs' eventual decision to disclaim the entire patent underscores that conclusion, as does IA Labs' four-month delay in dismissing the '226 patent from the case after announcing its intention to do so.

## II.    ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred in concluding that no reasonable jury could find infringement on the facts of this case when IA Labs' arguments defy the laws of physics and IA Labs failed to provide evidence satisfying all claim limitations.

2.    Whether the district court correctly construed the phrase "isometric exercise."

3.    Whether the district court was required to perform a claim-by-claim, element-by-element analysis before awarding fees under 35 U.S.C. § 285 when the patent owner limited its validity argument to an assertion that a single claim element was absent from the commercial embodiment.

### III.   STATEMENT OF THE CASE

Consistent with Federal Circuit Rule 28(b), Nintendo limits this statement to areas in which it disagrees with IA Labs' Statement of the Case.

IA Labs states that it "negotiated with Nintendo to license or sell one or more of IA Labs' patents (including the '982 patent) or other intellectual property." This statement is wrong and irrelevant.  IA Labs unilaterally offered to license or sell its patents to dozens of companies, including Nintendo.  Nintendo never responded to the offer, and no company ever offered to license or buy either the '982 or '226 patent.

IA Labs mentions the December 28 and 29, 2011 hearings before the district court, but merely says these hearings related to the parties' various summary judgment motions.  The district court also considered claim construction issues in these hearings.  A10029-41.  IA Labs further described the January 17 and 18, 2012 hearing as a "claim construction hearing."  The district court also heard arguments on non-infringement at that hearing.  A28-29, A10246-64.

IA Labs also asserts that it filed an emergency motion for leave to submit a supplemental brief on February 28, 2012 in response to Nintendo's motion for summary judgment of non-infringement.  That is true, but IA Labs neglects to mention that the district court orally announced its decision to grant summary judgment before IA Labs sought to supplement the briefing, making the district

court's subsequent grant of summary judgment unsurprising.  Finally, IA Labs'

suggests that the district court disregarded IA Labs' motion for reconsideration.

But the district court carefully considered that motion.  It simply concluded that IA

Labs' belated arguments could not change the result.

# IV.   STATEMENT OF FACTS

The district court's opinion contains a concise and accurate summary of the facts.  Nintendo therefore places the remainder of the facts in context to illuminate the support for the district court's decision.

## A.    The Invention Requires An "Effector" that "Provides" Isometric Exercise

The invention described and claimed in the '982 patent is focused on the "effector," a term coined by the inventor.  A188 (col. 4, lns. 26-36); A189 (col. 5, lns. 18-52).  The patent's figures show two embodiments, both having the same kind of effector: an elongated, rigid cylindrical rod with electrical strain gauges on the rod's surface.  A189 (col. 5, lns. 38-52); A190 (col. 8, lns. 10-33).  A user grasps the effector, and attempts to bend, pull or twist the rigid rod, thereby straining her muscles.  A189 (col. 8, lns. 45-63); A192 (col. 11, lns. 21-29).  The tiny deformation caused by the user's exertion against the rod is detected and transformed into electrical signals, so that a user's efforts to bend the rod will control a "virtual reality scenario."  A190 (col. 7, lns. 5-18); A192 (col. 11, ln. 21 – col. 12, ln. 19)  Thus, direct application of isometric muscle force to the rod simultaneously provides exercise and controls a game.  A191 (col. 10, lns. 50-55); A192 (col. 12, lns. 46-64).

### 1.    The Invention of the '982 Patent

The '982 patent describes using isometric exercise to control computer videogames.  The '982 patent was not the first exercise video game system, since many earlier systems controlled games using exercise with extensive movement of the body and muscles.  A187 (col. 2, lns. 53-65).  The '982 patent does not control videogames through movement, but instead describes and claims controlling videogames by exercising muscles without movement.  A188 (col. 3, ln. 65 – col. 4, ln. 25).  The patent calls such activity "isometric exercise."  According to the patent:

> Isometric exercise involves the exertion of force by a user against an object that significantly resists movement as a result of the exerted force such that there is substantially minimal, or no movement of the user's muscles during the force exertion.

A187 (col. 1, lns. 29-34).  Thus, isometric exercise occurs when muscles exert a force against an immovable object without movement.

The device of the '982 patent uses isometric exercise to produce an electrical output.  The amount of force exerted against the effector rod is detected, and then signals proportional to that force are sent to the game system.  A191 (col. 9, ln. 51 – col. 10, ln. 46).  The more a person strains against the unmoving effector, the more a character or object in the video game is moved on the screen.  A191 – A192 (col. 10, ln. 66 – col. 11, ln. 20).

The effector is the centerpiece of the '982 patent. The effector "provides" isometric exercise by being the object that significantly resists movement "such that there is substantially minimal or no movement of the user's muscles during the force exertion." A192 (col. 12, lns. 46-64). The '982 patent shows two versions of "effectors." In both, the user grasps and then exerts force against an unmoving rod. In the Figure 1 embodiment (shown below with labeling added), a user applies "bending, twisting, tension, compressive forces, etc." to the "effector" to perform isometric exercise. A188 (col. 4, lns. 33-36); A34.



As the district court explained, Figure 1 does not have a "frame," so the Figure 1 embodiment is not covered by the claims. A33. A frame is nevertheless present in the second embodiment, shown in Figure 2—what the district court called the "cockpit" embodiment. A34. The effector in that embodiment "includes a set of elongated and generally cylindrical effector bars," which consist of "any suitably rigid material (e.g., a metal alloy) that is capable of being slightly deformed within its elastic limit in response to any combination of bending,

twisting, tension and compression forces applied, for example, by the hands of a user to the bar." A190 (col. 8, lns. 10-12). A redrawn version of Figure 2 is shown below, with the parts labeled. A35. All of the rods are welded in position so they do not move. A190 (col. 7, ln. 65 – col. 8, ln. 29). In the cockpit embodiment, the user grips the handlebar-like rods and directly exerts forces in a variety of directions. A192 (col. 11, lns. 21-29; col. 11, ln. 43 – col. 12, ln. 19). The resistance from the rigid effectors thus provides isometric exercise.



A35

The '982 specification extensively discusses "isometric exercise." The patent begins by saying the invention "pertains to isometric exercise devices," A187 (col. 1, lns. 10-11), and contrasts isometric exercise with "conventional" forms of exercise "where a user's muscles are moved under resistance through a selected range of motion." A187 (col. 1, lns. 20-23). The patent distinguishes "isometric" devices from other kinds of exercise systems by explaining that, due

"to their inherently tedious nature, isometric exercise devices are less popular and, accordingly, are limited in type and availability, in comparison to more conventional" exercise devices. A187 (col. 4, lns. 37-41). These statements distinguish unmoving isometric exercise from exercise involving movement.

The patent's "Background of the Invention" describes examples of simple isometric exercises from outside the claimed invention: "pushing against a stationary surface (e.g., a doorframe or a wall), attempting to pull apart tightly gripped hands or to bend or flex a sufficiently rigid steel bar, etc." A187 (col. 1, lns. 34-37). The patent also notes that "isometric training" may be useful for "fighter jet pilots" because isometric muscle contractions can allegedly prevent "blackouts" caused by high gravitational forces. A187 (col. 1, lns. 26-29).

As the district court explained, the '982 patent also "expressly defines" the "key term" "isometric exercise." A44. *See also* A47 ("There can be little doubt that the patent defines 'isometric exercise.'"). See A187. The district court considered that definition the primary source for construing "isometric exercise" in the claims. *See* A47 ("'[T]he inventor's lexicography governs'"). That express definition does not refer to a user's body. A187.

The patent also describes performing isometric exercise using an "effector." In each embodiment in the patent, a user "engages in a combined isometric exercise by gripping at least one effector bar and applying muscle force to exert a

strain on the bar." A191 (col. 10, lns. 47-55). Isometric exercise in the invention involves applying force to a rigid bar or rod; no mention is made of an embodiment using parts of the user's own body.

The effector shown in Figure 1 is an "elongated and generally cylindrical bar or rod." A188 (col. 5, lns. 38-39.) During operation, a user "holds the bar at its opposing ends with his or her hands." A189 (col. 6, lns. 48-49). The user applies "a bending force using his or her hands." A189 (col. 6, lns. 49-51). This activity—"application of force by the user to the effector," A189 (col. 6, lns. 45-63)—is how the system "achieves an isometric workout for various muscle groups of the user of the system." A190 (col. 7, lns. 12-15). The Figure 1 system uses an effector "to facilitate isometric exercise," A190 (col. 7, lns. 28-29), not some other object.

The same is true of the "cockpit" system of Figure 2. This embodiment uses three "effector bars" configured "for manipulation by a user" while seated. A190 (col. 8, lns. 10-12). Strain is applied to the first bar (104) "as a result of the user pushing or pulling" on the second or third bars (106 and 108). A190 (col. 8, lns. 13-20 and col. 8, lns. 40-43). "Bending strain" is applied to the second and third bars when a user "attempts to twist the second and/or third bars to simulate turning or steering" of the handlebars. A190 (col. 8, lns. 47-51). During operation, "the user engages in a combined isometric exercise and interaction with the software

program by gripping at least one effector bar . . ."  A191 (col. 10, lns. 52-55).  The

specification describes providing other "optional" exercise devices to provide

dynamic exercises, but the "isometric exercise features [are] provided by

effectors."  A193 (col. 14, lns. 48-49).

### 2.    The Wii Balance Board Detects a User's Body Motion

The Balance Board is an accessory to the Nintendo Wii Game System, and

is used in a number of games, including the accused "Wii Fit" games.  A38-39.

The Wii game console revolutionized gaming when it was introduced in 2006.

Unlike conventional game controllers, the Wii also controlled games by detecting

the user's movement.  A38.  The Balance Board is one of many movement-based

controls for Nintendo's Wii system.

The Balance Board has a horizontal platform on which the user stands, similar to how a user stands on a household bathroom scale. As the user moves, the board detects how her weight shifts. A39. The Balance Board does this by sensing weight using "load cells," an approach that is similar to how a household bathroom scale senses weight. A39.



A1625

The Balance Board has four support legs attached to its bottom, one in each corner. A39. Each leg contains a weight sensor, called a "load cell," and each load cell detects the weight on a particular corner. A39. Each load cell detects vertically downward force. A76.

The load cells are assembled from two plates and a small aluminum block, called a "sensor block." A39. A strain gauge is attached to the sensor block and detects the tiny bending that occurs when the vertical force from a person's weight is directed onto the load cell. A39.

The strain gauges on each load cell send an electrical signal that is proportional to the weight detected on the Balance Board.  A76.  Special Wii software uses the output from each load cell to calculate the "center of pressure" on the Balance Board



IA Br. at 11

(sometimes called the "center of gravity.")  A39.  The Wii is thus able to determine the total weight exerted on the Balance Board by adding the total forces from each of the four load cells.  *Id*.  Because the Wii knows the position of each load cell on the Balance Board, the Wii is also able to calculate "center of pressure."  A39.

Changes in the center of pressure are used to control games.  *Id*.  Leaning to the right while standing on the Balance Board moves the center of pressure to the right.  Leaning left changes the center of pressure to the left, and leaning forward or backward changes the center of pressure forward or backward.  Thus, for example, a user can simulate using a snowboard by standing on the Balance Board and leaning in one direction or another.

The accused products include the "Wii Fit" software (and the later version called "Wii Fit Plus"), A39, which tracks how the user shifts her center of gravity.  Because every such shift results from movement, the software allows a user to

control a figure on the screen by shifting her weight. A39. In more complex games, a user can stand on the Balance Board and duck or dodge a "punch" to simulate boxing. A39. The Wii Fit software is pre-programmed to detect weight shifts that correspond to particular motions of a user. A39. The Balance Board is used by standing on the Board--games are not controlled by holding the Board in a user's hands and bending or twisting the Board.

One Wii Fit game, called the "Wii Ski Jump," became significant before the district court. A40. Shown below is part of the screen image of a character performing a ski jump. As the character skis down the ramp, the user stands on the Balance Board in a crouch like a skier. A40. The user maintains this position for a few seconds as the on-screen character speeds down the ramp. A40.

 

IA Br. at 14.

The upper right portion of the screen shows a moving red dot that represents the user's "center of pressure." A40. The red dot shows that the user's weight is slightly to the right of center (shown by the red dot's position

in the yellow area) and the user has her weight on her toes (because the dot is forward of center).  A40.  At the end of the ski ramp, the user attempts to "jump" by standing up from the crouch position just as the on-screen character reaches the ramp's end.  A40.



A40

Properly timing the "stand up" causes the character on the screen to jump, and excellent timing gives a user a higher score.  A40.

In the ski jump, as in all Wii Fit exercise, the Nintendo load cells detect the vertical force caused by body weight.  A64.  This occurs regardless of whether the user is standing upright or crouched.  A64-65.  If the user is standing motionless, no weight shift occurs, and the Balance Board does not detect any change in the center of pressure.  A64-65; A78.  If a person stands on the Balance Board and isometrically tenses her muscles, she is not moving and is therefore not shifting her weight.  A69.  The center of pressure then cannot change, and the Balance Board does not detect the isometrically tensed muscles.  A78.  Unless the user also shifts her weight, the Balance Board is unaware of any exercise.  A64.

Nintendo accordingly contended that the accused products do not use an "effector" to "provide" isometric exercise, and do not "control" a virtual reality game scenario "in accordance with" performance of isometric exercise.

### 3.    The District Court's Determination of Noninfringement

The district court provided a detailed, 50-page opinion evaluating claim construction and noninfringement.  That opinion considered each IA Labs argument.  It applied the applicable law, first by construing the claim terms and then by comparing the terms to the accused Nintendo products.  The district court concluded that Nintendo does not infringe, both by rejecting IA Labs' attempts to redesignate "weight" as muscle force and by concluding that no reasonable jury could find infringement.

### a.    IA Labs' Theory that the Balance Board Detects More Than Weight Shifts

The heart of IA Labs' infringement theory is the argument that the Balance Board detects isometric tensing of a person's muscles when she stands on the Balance Board.  IA Labs therefore offered the testimony of a physiologist, Allen Drury, Ph.D., who tried to transform "weight" into "muscle force."  A72; A75.  As the district court explained, IA Labs "relies on Dr. Drury's report to argue that because the user engages in isometric exercise while standing on the Balance Board, the force exerted against the Balance Board (and that which causes the effectors to deform) is the force of the isometric exercise."  A72.

IA Labs argued that the force on the Balance Board when a person stands upright is the user's weight.  A73-74.  However, IA Labs says that when the same person crouches on the Balance Board (as, for example, when they are in the ski

jump position), the force on the Balance Board changes: 98% of the force is now muscle force and only 2% is the person's weight. A76-77. IA Labs admitted that the total force on the Balance Board (the sum of the "muscle force" and 2% of the weight) does not change, but contends that crouching transforms most force from weight to muscle force. A74-77. Neither IA Labs nor Dr. Drury explained how 98% of a user's weight disappears when crouching—and then returns when she stops crouching.

The district court rejected IA Labs' argument, and described IA Labs' error. As the court explained: "When a user squats on the Balance Board, the isometrically exercised muscles exert force on the body to counteract the weight carried and must hold the body in a fixed position. This exercise does not affect the total downward force exerted against the Balance Board, which is equal to the force of the user's weight." A73. The court noted that the "aggregate force remains unchanging regardless of whether the user stands upright, squats slightly, or squats deeply." A73. The district court concluded that the Balance Board "is not the 'object' against which the user exerts force and that significantly resists movement as a result of that force, as required by Claim 1." A73. Thus, no isometric muscle force is exerted against the Balance Board.

The district court noted that IA Labs did not dispute its analysis of forces on the Balance Board, and further noted that Dr. Drury's own report confirmed these

"physical realities." A73. The district court then discussed IA Labs' contention that Dr. Drury's opinion created an issue of fact. The court explained that "[t]he only thing in Dr. Drury's report that is inconsistent with the court's analysis is his conclusion that isometric force is also exerted downwards onto the Balance Board." A73. The district court then rejected that contention, because it was merely "an unsupported assertion that the accused device contains a critical claim limitation and clearly would be insufficient, standing alone, to create a genuine issue of material fact." A73-74 (quoting *Arthur A. Collins, Inc., v. N. Telecom, Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000)).

The district court described the legal support for its view that Dr. Drury's opinion does not create an issue of fact. Dr. Drury had concluded "that a user can exert isometric exercise force against the Balance Board." A74. But the district court relied upon the absence of underlying facts in Dr. Drury's opinion, and explained that Drury's opinion lacked "sufficient detail for the court to be certain that features of the accused product would support a finding of infringement." A74 (quoting *Intellectual Sci. & Tech., Inc. v. Sony Elec., Inc.*, 589 F. 3d 1179, 1183 (Fed. Cir. 2009)). The district court said: "[i]f all expert opinions on infringement or noninfringement were accepted without inquiry into their factual basis, summary judgment would disappear from patent litigation." A74 (quoting *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001)).

The district court then explained what a "closer inspection" of Dr. Drury's explanation reveals: "that this apparent dispute is really just semantics." A74. Dr. Drury's theory that "98%" of the weight changes to muscle force "is merely describing a portion of that force as 'isometric force' when the user engages in isometric exercise." A74. The court then explained the error in IA Labs' contention: "[t]he force of the user's weight does not cease to exist while she engages in isometric exercise such that her weight somehow converts into 'isometric force'." A74. As a matter of fundamental physics, "at all times that the user stands on the Balance Board—before, during, and after she engages in isometric exercise—she exerts a constant, aggregate force of 200 pounds against the Balance Board." A74-75.

### b.    The District Court's Discussion of the "Provides" Limitation

The district then analyzed IA Labs "provides" argument. IA Labs contends that the Balance Board "provides" isometric exercise because the user supposedly exerts isometric muscular force against the load cells in the Balance Board when she stands on the Board playing games. In IA Labs' theory, some games are controlled using isometric muscular force. A74-75.

The district court rejected IA Labs' theory. The district court explained that, because the only force detected by the Balance Board is the user's weight, "the Balance Board does not contain an effector to 'provide an isometric exercise'

because the Balance Board has no feature that enables a user to perform isometric exercise that she could not otherwise perform." A75. Thus, "[t]he question is not whether isometric exercise can theoretically occur while a person stands on the Balance Board, but, rather, whether the force applied against the Balance Board results from such exercise." A75. The district court further explained that "[e]ach and every isometric activity that IA Labs has identified as occurring on the Balance Board is possible only by reason of the force of gravity on the user's body—which affects a constant aggregate force on the Balance Board during use—not because of any structural component provided by the Balance Board." A75.

The district court summarized its rejection of the IA Labs "provides" argument as follows: "IA Labs may not manufacture a dispute of fact simply by renaming a portion of the user's weight 'isometric force' whenever a user engages in isometric exercise." A75. Moreover, IA Labs "identified no fact in dispute that prevents a finding, as a matter of law, that when one engages in a squat or any other allegedly isometric activity on the Balance Board, the isometrically exercised force is exerted against the body and the force of weight is exerted against the effectors of the Balance Board." A75. The district court concluded that IA Labs "failed to prove that the Balance Board contains 'an effector to provide an isometric exercise for said user, wherein said effector is fixedly secured to said frame and includes an elongated rod.'" A75.

### c.    The District Court's Discussion of the "In Accordance with" Limitation

The district court identified an additional missing limitation. Every asserted claim requires that virtual reality scenario controlled "in accordance with performance of said isometric exercise," but the district court determined the Balance Board lacked that limitation. A78-79. The force measured by the Balance Board load cells corresponds only to "the distribution of the user's aggregate weight across the four load cells, and not to any variable isometrically exercised muscle force." A78. Without a virtual reality scenario controlled by isometric muscle force, there cannot be any control of that scenario "in accordance with performance of isometric exercise." A78.

The district court described the absence of evidence: "IA Labs has offered no evidence to suggest that a user could, in fact, control any of the Wii Fit games 'in accordance with isometric exercise.'" A78. The district court then discussed an attempt by IA Labs' counsel to demonstrate, at oral argument, that holding a "squat" during the ski jump is detected by the Wii console and used to control the game. But these demonstrations showed "that the Balance Board detects shifts in the user's center of gravity as her weight is redistributed over the four load cells." A78. Thus, "movements control the game", not muscle force against the load cells. A78. The district court further explained that "[i]f the user could maintain a perfectly still squatting position, her center of gravity would not shift, and she

could not control the game.  IA Labs' effort to demonstrate that a user could

control a Wii Fit game by isometrically tensing her toes and pressing them onto the

Balance Board was wholly unpersuasive."  A78.  Moreover, "when counsel

allegedly isometrically exercised his toes, nothing registered on the screen."  A78.

The district court therefore concluded that the Balance Board does not control a

virtual reality scenario "in accordance with performance of said isometric

exercise."  A79.

> ### d.    The District Court's Construction that "Isometric Exercise" Requires the User to Strain Against an Effector, Not Against Herself

The '982 patent contrasts isometric exercise with "conventional" forms of

exercise "where a user's muscles are moved under resistance through a selected

range of motion."  A187 (col. 1, lns. 37-41).  The specification provides general

examples of isometric exercise (outside the context of the claimed invention),

including "pushing against a stationary surface (e.g., a doorframe or a wall),

attempting to pull apart tightly gripped hands or to bend or flex a sufficiently rigid

steel bar, etc."  *Id.*  (col. 1, lns. 34-37).  The district court recognized that the patent

involves a particular kind of isometric exercise and that the specification

"expressly define[d] how that term was used in the claims."  A44; *see also* A47

("There can be little doubt that the patent defines 'isometric exercise,'").

The district court held that the inventor's definition governed so the claimed "isometric exercise" could not include exertion of force against the user's own body. A47-54. Among other things, the district court noted that allowing the user's own body to be the "object" against which she exerts force would contradict the claim language requiring an "effector" to "provide" the claimed "isometric exercise" and a "sensor" to be "responsive" to the force applied by the user in performing that exercise. A48-49. "[F]or the effector 'to provide an isometric exercise,' and for the sensor to be 'responsive' to that isometric exercise force, the *effector* must be the 'object' against which the user exerts force and that significantly resists movement as a result of that force," A49 (emphasis original). If the user's body were the "object" resisting force, the court observed, the effector would not be providing exercise. *Id*.

The court did, however, agree with IA Labs that the requirement of "substantially minimal or no movement of the user's muscles during the force exertion" "need only apply to the muscles engaged in isometric exercise and not to all of the muscles in the user's body." A53. Nintendo did not disagree, and that minor clarification did not affect the court's summary judgment ruling.

## B. The District Court's Exceptional Case Finding and Fee Award Based on IA Labs' Assertion of the Invalid '226 Patent

After granting summary judgment, the district court held that the case was "exceptional" under 35 U.S.C. § 285, ruling IA Labs had no legitimate grounds to

assert a second patent, the '226 patent, because IA Labs knew before filing suit that the '226 patent was invalid due to public use and offers for sale more than a year before its filing date. A88-90. The district court accordingly awarded Nintendo slightly over $200,000 in attorneys' fees for defending against IA Labs' assertion of that patent. A92; A94.

### 1.    The Claimed Invention of the '226 Patent

IA Labs purchased the '226 patent (and the '982 patent) from a now-defunct company known as Interaction Laboratories, Inc. ("Interaction"). A170. The principals of IA Labs included some of the principals of Interaction. A89.

The application for the '226 patent, entitled "Force Measurement System For An Isometric Exercise Device," was filed on May 20, 2005. A196. Figures 3A and 3B of the patent showed "perspective views of isometric exercise systems serving as gaming controllers and utilizing an effector device according to the present invention":



A206 (col. 3, lns. 19-21).

As with the '982 patent, the centerpiece of the '226 patent was the "effector" (labeled "110" above). The '226 patent's effector was a rigid tube having a "hollow interior" with an "inner support" structure within the hollow interior. Strain gauge sensors measuring forces applied by the user were attached to the "inner support." A214-15 (Claims 1, 10, 19); A206 (col. 3, lns. 57-64).

Each claim of the '226 patent required the same essential features. Claim 1 is representative:

> 1. A force measurement system comprising:
>
> an **effector** device including a **hollow interior**;
>
> an **inner support** disposed **within said hollow interior** of said effector device; and

at least one **sensor secured at a selected location to said inner support** and configured to **measure a force** applied to said inner support;

wherein at least one outer surface portion of said inner support is coupled with at least one interior surface portion of said effector device such **that forces applied to said effector device are at least partially transferred to said inner support for measurement by said at least one sensor**.

A214 (col. 20, lns. 35-47) (emphasis added).

Interaction called its "inner support" strain gauge arrangement the "tube inside the tube method." A1557. This design was also referred to as "Isocore" in Interaction's marketing literature. A1560. Peter Tsai, a named inventor on the '226 patent, implemented the "tube inside a tube" approach to address problems with Interaction's early products. A1551-52; A1556-58; A1560.

### 2.    The '226 Patent's Invalidity Under 35 U.S.C. § 102(b)

The '226 patent was invalid under 35 U.S.C. § 102(b) because Interaction's commercial embodiment of the invention was both publicly used and on sale in this country well over a year before Interaction applied for the patent.

The relevant Interaction product was the "Kilowatt," which incorporated the "tube inside a tube"/"Isocore" approach. Figure 3A from the patent and a picture of the publicly disclosed Kilowatt are below. The Kilowatt was indistinguishable from a preferred embodiment of the '226 patent.



FIG.3A

A1562; A1655-56; A1659-60; A1677; *see also* A1564-A1565. The Kilowatt had

all of the features of the claims, including: (i) a vertical rod (effector) supporting a

controller; (ii) a hollow interior of the rod containing a strain gauge sensor attached

to an inner support; and (iii) force applied to the exterior of the rod was transferred

to the inner support for measurement by the sensor. A1336-37.

A mountain of evidence was presented to the district court showing the

Kilowatt was on sale and publicly used. From January to May 2004, over a year

before the '226 patent was filed in May 2005, Interaction demonstrated the

Kilowatt and its "tube inside a tube"/Isocore concept at trade shows, to customers,

and to the media. Those demonstrations included the January 8-11, 2004

International Consumer Electronics Show ("CES") in Las Vegas, A1460; A1562;

A1564-65; A1628; A1642-43; A1652; A1655; the January 12-14, 2004

SuperShow of the Sporting Goods Manufacturers Association, in Orlando, Florida,

A1652; A1659; a demonstration at an arcade called "Play" in Greenwich Village,

which *The New York Times* described on February 5, 2004, A1749-50; A1453-54;

and a May 10-14, 2004, demonstration at the Electronic Entertainment Expo

("E3") in Los Angeles, which was reported on by at least 49 media outlets reaching

a circulation of over 2.8 million readers, A1721-30.  Interaction boasted that

thousands of people were exposed to the Kilowatt at these exhibitions.  A1752,

A1761.

Interaction also repeatedly offered the  "tube inside a tube" configuration for

sale in early 2004, more than a year before the '226 application was filed.  By

January 7, 2004, Interaction had offered the Kilowatt for sale on *PowerGrid*

Fitness' website.  A1794-95.  Between January 8-14, 2004, due to positive

response at the CES show in Las Vegas, ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████

### 3.    IA Labs' Knowledge of Invalidity of the '226 Patent When it Sued Nintendo and Its Disclaimer After Nintendo Confronted it With the Evidence of Invalidity

IA Labs filed this case on April 2, 2010.  The scope of the invalidating

activities, IA Labs' Complaint, and discovery provided during the case left no

doubt that IA Labs knew that the '226 patent was invalid when it sued Nintendo.

Greg Merril, one of IA Labs' two corporate officers, was also the co-founder, CEO and President of Interaction. A2103-04; A1431; A89. Merril is a named inventor on the '226 patent and personally participated in or knew about most if not all of the public-use and on-sale activities. *See* A1448-52; ███████

████████████████████████████████████████████████████████

████████████████████████████A1859-60.

Indeed, IA Labs' Complaint included a lengthy description of the development and commercial activities of Interaction and the named inventors, Merril and Feldman, and described awards that Interaction received at tradeshows where the products were displayed and sold. A169-170.

IA Labs nevertheless sued on the '226 patent—and pursued its claim for several months after Nintendo detailed the evidence of invalidity in this action. *See* A90. IA Labs' served expert reports with infringement theories, forcing Nintendo to continue preparing its defenses against the '226 patent despite the strong evidence of invalidity. A1912-23, A1978. In October 2010, IA Labs suggested that it might drop the '226 patent from the case, but it did not do so until February 2011. A90. By then, Nintendo had run up hundreds of thousands of dollars in fees to defend against that patent. A91.

On February 8, 2011, IA Labs executed a covenant not to sue on the '226 patent. A2011. That covenant was limited to Nintendo, but ten days later IA Labs

-29-

filed a statutory disclaimer of the entire '226 patent with the PTO, belatedly

acknowledging its complete invalidity.  A1381.

### 4.    The District Court's Exceptional Case Finding and Fee Award

After detailed briefing, the district court carefully considered the record and

evidence.  It granted Nintendo's attorney fees in part, reducing the request fees by

a third to $218,159.25.  A85; A92-93.  The district court applied the correct legal

standard, requiring Nintendo prove that this case was "exceptional by clear and

convincing evidence" and that IA Labs brought "objectively baseless" litigation

"in bad faith"  A86-88.

IA Labs did not dispute that Interaction publicly used the Kilowatt and

offered it for sale before the critical date.  Nor did IA Labs deny that it knew those

facts before it filed suit.  IA Labs also did not deny that the Kilowatt, as publicly

used and offered for sale before the critical date, met all limitations of the claims

except one.  IA Labs made only one substantive argument:  that the publicly

displayed and on-sale Kilowatt did not include the "tube inside a tube" feature.

A87; A2239.  Nintendo, however, demonstrated the unreliability of IA Labs

"evidence" and the court rejected the argument as "disingenuous."  A88 and 89.

The district court specifically found that:

- The Kilowatt "embodied the invention of the '226 Patent."  A88.
- "It was sharply apparent that the Kilowatt had been publicly demonstrated at trade shows, disclosed in numerous publications, and

offered for sale more than a year prior to the filing of the patent application." A88.

- "Thus, the '226 patent was, without question, statutorily invalid pursuant to the 'on-sale bar.'" A88.

- "IA Labs does not and cannot dispute that it was aware of the on-sale activities. Instead, it argues that certain features of the '226 Patent were missing from the Kilowatt. This argument is disingenuous." A89.

- "IA Labs does not actually argue that the '226 patent is valid. A89.

- "IA Labs took the extraordinary step of disclaiming the patent, implicitly acknowledging its invalidity." A89.

Based on its analysis of the evidence and arguments, the district court found that the '226 patent was invalid and "that IA Labs clearly knew the patent was invalid when it commenced the litigation." *Id.* The district court further recognized "[t]hat IA Labs waited more than two months after Nintendo asserted counterclaims of invalidity to inform Nintendo that it would abandon its claim under the '226 patent and four more months to actually do so . . ., which not only caused Nintendo to incur substantial defense costs, but further evidenced bad faith." A90. Finally, the district court considered and decided the issue again upon IA Labs' Rule 59(e) motion. A9953 and A98.

## V.    SUMMARY OF THE ARGUMENT

The district court granted summary judgment after a careful and thorough analysis of the facts and the law.  The district court evaluated every argument made by IA Labs, and did so in detail.  It conducted two lengthy hearings where IA Labs explained every aspect of its claim construction arguments and its infringement contentions.  The district court then rendered a 50-page opinion that provided a well-reasoned application of Federal Circuit precedent to every argument IA Labs made.  The district court recognized the striking differences from the '982 patent's invention, and properly concluded that Nintendo does not infringe.

No reasonable jury could find infringement.  The Balance Board cannot detect isometric muscular force, so it cannot "provide" isometric exercise.  IA Labs argues otherwise, but does so by disregarding the laws of physics to make a user's weight vanish.  Such arguments cannot support infringement.  The Balance Board also controls games by detecting weight shifts, not by acting "in accordance with" isometric exercise.  IA Labs failed to set forth evidence showing that isometric muscular contractions control games.

The district court's construction of "isometric exercise" was unambiguous and correct.  The claims and specification provide ample support for the district court's construction.  In the invention, isometric muscular force is exerted against the effectors, not against the user's own body.  The district court also correctly

concluded that the sensors of the invention respond to isometric muscular force, not weight shifts.

The attorney fee award was supported by overwhelming evidence showing the principals at IA Labs were aware of the on-sale and public use activity invalidating the '226 patent.  IA Labs' only argument opposing Nintendo's fee motion was that the "tube inside a tube" structure was not present in the product placed on sale.  The district court correctly concluded that detailed evidence showed the presence of the "tube inside a tube" structure, so it properly rejected IA Labs' argument.  The district court also fully considered, and applied, the presumption of validity.

## VI.    ARGUMENT

### A.    No Reasonable Jury Could Find Infringement on the Facts of Record

"To support a summary judgment of noninfringement it must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee." *Techsearch, LLC v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002) (citing *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1351 (Fed. Cir. 2001)).  The district court properly applied this standard and identified multiple non-infringement grounds.

The district court correctly construed "isometric exercise"; applying that construction to the Balance Board compels a conclusion of non-infringement.  The district court's opinion is, however, not limited to an absence of "isometric exercise."  Every asserted claim also requires that the effector "provide" isometric exercise, and every asserted claim requires that games be controlled "in accordance with the performance of . . . isometric exercise."  A194.  Both limitations are missing, as the district court carefully explained.[1]  The absence of either is sufficient to conclude that no reasonable jury could find infringement, regardless of how "isometric exercise" is construed.

### 1.    No Reasonable Jury Could Find that the Balance Board "Provides" Isometric Exercise

Both independent claims require an effector that will provide isometric exercise; claim 1 requires "an effector to provide an isometric exercise" and claim 9 says "wherein said effector provides an isometric exercise."  A194.  The district court construed both to mean "the user's isometrically exercised muscles exert force against the effector either through direct contact or indirect contact."  A56.  IA Labs has not challenged this construction.  Applying the construction, the district court recognized the absence of any muscle force applied against the

---

[1] Claim 1 also requires that the invention have sensors "responsive to" isometric exercise forces.  The District Court correctly explained why the load cells in the Balance Board are not responsive to isometric exercise.  That explanation provides a further ground for non-infringement of Claim 1.  A76-77.

Balance Board, and therefore correctly rejected infringement.  A72.  As the district court explained:  "the load cells on the Balance Board respond only to the user's distributed weight; they cannot detect any other type of force."  A64.  Without detecting muscle force, the Balance Board cannot provide isometric exercise.

Dr. Drury, IA Labs' expert, argued that isometric muscular force is applied to the Balance Board, IA Labs' Br. at 50-51, and IA Labs contends that argument precludes summary judgment, IA Labs' Br. at 53.  IA Labs is wrong.  A district court need not hold a trial whenever a plaintiff submits an expert opinion.  Instead, the district court evaluates whether the opinion creates "genuine" issues.  Such issues do not automatically arise from expert opinions, and cannot be created by opinions that defy the laws of physics.  The district court detailed the absence of a scientific basis for Dr. Drury's opinion, and explained the law mandating rejection of that opinion.  A73-74.  As the district court said, Dr. Drury's opinion was mere semantics that labeled a user's "weight" as "muscle force."  A74.

Central to IA Labs' argument is the contention that a person crouching on the Balance Board has almost none of her weight applied to the Board.

According to IA Labs, a person standing on the Balance Board with her knees locked and muscles relaxed exerts 100% of her weight on the Board. IA Labs' Br. at 43. But when that same person crouches on the Balance Board, IA Labs says 98% of the force is now muscle force, and only 2% is her weight. Neither IA Labs nor



IA Br. at 14

Dr. Drury explained how 98% of a person's weight can disappear, or where that weight goes. Weight cannot disappear, and IA Labs' argument defies basic physics.

The district court correctly rejected IA Labs' sophistry. A75. Merely tensing muscles does not make a person's weight disappear—IA Labs' argument is no more reasonable than contending that the sun rises in the West, and such statements by an expert need not be presented to a jury – no reasonable jury would accept them.

Multiple cases hold that an expert's opinion does not automatically create a "genuine" issue of material fact, and the district court carefully applied that precedent. As this Court explained in *Invitrogen Corp. v. Clonetech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) "[a] party does not manufacture more than a merely colorable dispute simply by submitting an expert declaration asserting that something is black when the moving party's expert says it is white; there must be

some foundation or basis for the opinion." *Accord*, *K-TEC, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1374 (Fed. Cir. 2012). No such foundation is present here.

*Invitrogen* and *K-TEC* are two of many cases highlighting the deficiencies in IA Labs' argument. This Court's long-standing precedent also supports rejecting expert opinions when they are conclusory. *See Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004); *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed. Cir. 1998). Expert opinions can be ignored on summary judgment if they are not expressed "in sufficient detail for the court to be certain that features of the accused product would support a finding of infringement." *Intellectual Sci. & Tech., Inc. v. Sony Elecs., Inc.*, 589 F.3d 1179, 1183 (Fed. Cir. 2009) (citing *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1047-48 (Fed. Cir. 2000)). Dr. Drury's opinions lacked the necessary underlying details. Similarly, an expert's opinion must have an explicit factual foundation; absent that foundation, the opinion can be ignored. *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001).

These principles flow from the requirement that issues of fact must be "genuine." Fed. R. Civ. P. 56. "Only disputes over facts that might affect the outcome of this suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, the mere existence of Dr. Drury's opinion cannot create an issue of fact

precluding summary judgment.  "If all expert opinions on infringement or

noninfringement were accepted without inquiry into their factual basis, summary

judgment would disappear from patent litigation."  *Novartis*, 271 F.3d at 1051.

These principles are consistent with the district court's "gatekeeper" role

under *Daubert v. Merrel Dow Pharm., Inc.*, 509 U.S 579 (1993).  As the Supreme

Court explained:  "*Daubert* . . . did indicate that, while the Federal Rules of

Evidence allow district courts to admit a somewhat broader range of scientific

testimony than did pre-existing law, they leave in place the trial judge's

'gatekeeper' role of screening such evidence to ensure that it is not only relevant

but reliable."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 136 (1997) (holding the

district court properly excluded expert evidence in granting summary judgment).

When expert opinion does not meet the reliability requirements of *Daubert*, district

courts may properly reject those opinions on summary judgment.

Here, the district court detailed the deficiencies in IA Labs' contention that

Dr. Drury's opinion created a genuine issue of material fact.  A74-75.  "A closer

inspection of Dr. Drury's explanation reveals that this apparent dispute is really

just semantics."  A74.  As the district court explained, when Dr. Drury contends

that "weight" is transformed into "muscle force,"

> Dr. Drury "is merely describing a portion of that force as
>
> 'isometric force' when the user engages in isometric

> exercise.  This does not advance the cause of IA Labs.
>
> The force of the user's weight does not cease to exist
>
> while she engages in isometric exercise such that her
>
> weight somehow converts into 'isometric force'."

A74.  Indeed, elementary physics precludes a disappearance of weight and a sudden transformation of weight into muscle force.  Thus, "IA Labs may not manufacture a dispute of fact simply by renaming a portion of the user's weight 'isometric force' whenever a user engages in isometric exercise."  A75.  The district court was correct, and no reasonable jury could find that the Balance Board "provides" isometric exercise.

### 2.    The Enoka Reference is Irrelevant to Non-Infringement

IA Labs' brief (at 33-34) relies on diagrams from a text by Professor Enoka, and Dr. Drury's explanation of those diagrams.  IA Labs attempts to use the Enoka diagrams to support its proposed construction of "isometric exercise," and to support IA Labs' theory that the Balance Board "provides" isometric exercise, i.e., that a person crouching on the Balance Board exerts muscle force against the Balance Board's load cells.  IA Labs' Br. at 33-34; 42-43.

IA Labs' arguments are not well taken.  The Enoka diagrams are generalized explanations of a person crouching, and do not address any issue in this case.  They do not show or discuss the Balance Board.  The diagrams do not discuss any

muscle force, let alone any downward muscle force.  Instead, the diagrams show:

1) the ground reaction force, 2) the weight of a person's foot, and 3) the "joint

reaction" force.  IA Labs' Br. at 33-34.  The only mention of muscles occurs where

Enoka mentions net "torque" IA Labs' Br. at 34, but "torque" and "force" are two

different things--and in any event, "torque" has a circular, not downward,

direction.

The Enoka diagrams do not even say whether the person shown is moving.

Instead, the Enoka diagrams illustrate some forces that can exist in an unspecified

circumstance inside a person's body.  They do not describe muscle force exerted

against anything a person stands on.  IA Labs nevertheless suggests Enoka

illustrates muscle force in a downward direction, and that the muscle force is

directed against the surface on which a person stands.  IA Labs' Br. at 35.  The

Enoka diagrams say none of this.  The Enoka diagrams provide no support for IA

Labs' claim construction arguments, nor do they support IA Labs' arguments that a

person crouching on the Balance Board produces muscle force against the Board.

### 3.    Dr. Phillips' Opinion Does Not Support IA Labs' Theory

IA Labs further attempts to bolster its arguments by suggesting they are

supported by the opinions of Dr. Chandler Phillips, an MD and Professor of

Mechanical Engineering.  IA Labs' Br. at 35-37.  Dr. Phillips is Nintendo's expert,

and he provided detailed explanations for why the Nintendo products do not

infringe.  A2537-46; A9030-40.  IA Labs nevertheless focuses on a small part of Dr. Phillips' expert report and contends that Dr. Phillips' explanation of the forces inside a user's foot contradict Dr. Phillips' overall explanation.  IA Labs' Br. at 35-37.  According to IA Labs, this supposedly creates a genuine issue of material fact.  IA Labs' Br. at 44-50.  IA Labs is again wrong.

IA Labs' reproduction of the illustrations from Dr. Phillips' report is shown below.  IA Labs' Br. at 50.



The illustration compares two circumstances.  On the right, the person has her weight evenly distributed between her heel and toe; on the left, she has more of her weight on her heels.  IA Labs contends that Dr. Phillips somehow says "the muscles in the lower leg *do exert a downward force*."  IA Labs' Br. at 36 (emphasis added).  IA Labs follows with the actual statement by Dr. Phillips, which says the exact opposite:  Dr. Phillips said "the first outcome is that the calf *muscle upward force* results in an equal and opposite joint reaction force (80 lbs)

-41-

directed downward through the leg bone onto the top of the ankle joint." A9035 (emphasis added). IA Labs cannot create an issue of material fact by transforming Dr. Phillips' reference to "upward" muscle force into a supposed admission that "muscles in the leg do exert a downward force."[2]

IA Labs' contentions are more bizarre when compared to the rest of Dr. Phillips' report. Dr. Phillips explained that IA Labs was "unscientific" when it contended a person exerts downward muscle force onto the Balance Board by standing on their toes. A9035. IA Labs tries to turn Dr. Phillips' opinion on its head. But a *genuine* issue of material fact cannot be created by pretending that "upward" means "downward." Dr. Phillips' opinions provide no support for IA Labs' contentions.

### 4. No Reasonable Jury Could Find that the Balance Board Controls Games "in Accordance with" Isometric Exercise

Both independent claims of the '982 patent require a "virtual reality scenario" (i.e., a game) controlled "in accordance with performance of said isometric exercise." A194 (col. 15, lns. 50-54; col. 16, lns. 29-31). The district court concluded that "IA Labs has offered no evidence to suggest that a user could,

---

[2] IA Labs repeatedly characterizes Dr. Phillips opinions as "new." The only thing that was actually new, however, was IA Labs' theory of Dr. Phillips' explanation. Regardless, the district court considered IA Labs' arguments about Dr. Phillips supposedly "new" theory, both in IA Labs' motion to supplement, A9124-26, and in IA Labs' motion for reconsideration. A9629-41. The district rejected IA Labs' argument both times. A82-83.

in fact, control any of the Wii Fit games 'in accordance with isometric exercise.'" A78.  IA Labs argues this conclusion is wrong, and identifies sources of supposed supporting evidence.  IA Labs' Br. at 54-55.  None of the sources provide evidence that the game is controlled "in accordance with" performance of isometric exercise.

IA Labs first points to a Japanese game titled "Pelvic Fitness with Wii," and subtitled "Wii's Isometric and Karate Exercise."  IA Labs' Br. at 54.  According to IA Labs, the existence of the game is evidence that Nintendo will "offer or license activities for the Balance Board that are specifically designed and marketed for the user to perform isometric exercise. "  IA Labs' Br. at 54.  Yet nothing in the record describes what the "Pelvic Fitness with Wii" game actually does, nor does any evidence exist of how the game is controlled.  IA Labs did not even offer evidence suggesting that "Pelvic Fitness with Wii" was sold in the United States – the only record evidence is the game's package, which shows the game was not sold by Nintendo.  A5903.  And because the package labeling is in Japanese, the game was apparently sold in Japan.  A5903.  These facts do not show any admissions by Nintendo.  They do not remotely describe a user controlling a game by isometrically exerting muscles, nor do they contradict the district court's

description of the Balance Board as operating by detecting a person's weight shifts. "Pelvic Fitness with Wii" cannot create a genuine issue of material fact.[3]

IA Labs next points to the opinion of its computer science expert, Dr. Bederson. IA Labs' Br. at 54. The testimony of Dr. Bederson on muscle operation was excluded by the district court, and properly so: Dr. Bederson has no qualifications whatsoever to opine on muscle force and muscle control. A66. IA Labs has not challenged the exclusion of the Bederson testimony, and excluded testimony cannot create an issue of fact. *See* Fed. R. Civ. P. 56(c) (emphasizing that disputes of fact must be supported by admissible evidence).

IA Labs also argues that Dr. Drury's opinion supports the "in accordance with" limitation. Yet IA Labs' brief provided only a single sentence addressing how Dr. Drury dealt with that limitation: "Dr. Drury described how the user controls the virtual reality scenario by performing an isometric activity, such as the downhill ski jump activity." IA Labs' Br. at 54. This is a conclusion, not a description of facts, and cannot preclude summary judgment.

IA Labs' argument included two citations to the appendix purporting to support Drury. Neither actually supports IA Labs' contention. The first, A4909,

---

[3] IA Labs (at 48) also discusses the testimony of Mr. Yamazaki, who said (in Japanese) that the Balance Board "can measure force as well as the person's weight." A5612. IA Labs never says why this statement has any significance, especially since "weight" is a force. IA Labs' mention of Mr. Yamazaki's vague testimony does not identify any error in the district court's conclusion that it did not "see how the statement would in any way alter its analysis." A76 n.30.

merely describes what a user does on the Balance Board, and the second, A8998, describes the user as "shifting your body weight from one side to another." Descriptions of how a user moves on the Balance Board do not show how a game is controlled, let alone show that isometric exercise controls the game.

The second citation, A8998, is also a Drury opinion. It characterizes weight-shifting on the Balance Board as "isometric exercise to manipulate the effectors so the user can steer, or move laterally, in the virtual reality scenario." A8988. This is also a conclusion—calling a weight shift "isometric exercise to manipulate" is mere semantics. It provides no underlying facts, and cannot create a genuine issue of material fact.

Mere conclusions from an expert cannot support infringement; underlying facts are necessary. *Tokai Corp. v. Easton Enter., Inc.*, 632 F.3d 1358, 1366 (Fed. Cir. 2011). No reasonable jury could find infringement from the absence of facts presented by IA Labs, so the district court properly concluded that the "in accordance with" limitation was missing.

**B.      The District Court Correctly Construed "Isometric Exercise"**

The district court construed "isometric exercise" to require exertion of force against the effector rather than against a body part. The district court was right.

### 1.   The District Court's Construction of "Isometric Exercise" Was Not Ambiguous or Uncertain

IA Labs contends (at 24) that the district court used "inconsistent language" in its claim construction, so that it is "unclear precisely how it construed 'isometric exercise.'"  IA Labs is mistaken.  The district court adopted the patent's express definition of "isometric exercise," with one modification (italicized below) to clarify a potential ambiguity:

> the exertion of force by a user against an object that significantly resists movement as a result of the exerted force such that there is substantially minimal or no movement of the user's muscles *associated with the isometric exercise* during the force exertion.

A54.  This construction is unambiguous.

The summary judgment order provided a well-reasoned explanation of the grounds for the court's construction.  A47-A55.  The modification of the express definition clarifies that the phrase "substantially minimal or no movement" applies only to "muscles engaged in isometric exercise," not every muscle in the user's body.  A53.  This conclusion is consistent with the description of isometric exercise in the specification.

IA Labs also contends (at 24) that one cannot determine whether the district court excluded exercises where a user's body is partly the object of isometric exercise, or just where "the user's body and only the user's body" is the "object."

Yet the district court unambiguously rejected IA Labs' proposal to make "the object" "include a user." A48-A49.

## 2. The Effector, Not the User's Body, "Provides" Isometric Exercise

The district court's construction of "isometric exercise" relies on the most important sources in claim construction: the language of the claims and the written description of the invention. In contrast, IA Labs' arguments depend on extrinsic expert testimony, which this Court has recognized has limited value. The district court correctly construed "isometric exercise," and this Court should reject IA Labs' attempt to broaden the claims of the '982 patent contrary to the intrinsic record.

### a. The Claim Language Confirms that the "Effector," Not the User's Body, is the Object that Significantly Resists Movement

The district court correctly applied *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and relied on the claims for guidance regarding the meaning of disputed claim terms. How a term is used in context is highly instructive. *Id.* at 1314. In addition, both asserted and unasserted claims can aid in determining claim meaning, because claim terms are typically used consistently throughout the patent. *Id.* The District Court applied these principles when construing "isometric exercise."

As the district court recognized, IA Labs' proposal to include exertion against the body was "plainly incompatible with claim 1" because the language of the claims shows that an effector, not a user's body, is the object that must provide the isometric exercise. A48. Claim 1 requires "an effector to provide an isometric exercise for said user," and a "sensor" that is "responsive" to "force applied by said user to said effector to perform said isometric exercise." A194. Thus, an effector, not a user, must "provide" the isometric exercise. Likewise, a sensor is responsive to force applied "to said effector to perform isometric exercise," not force applied to the user herself.

IA Labs' suggestion that isometric exercise can be performed without applying muscle force to an effector is incompatible with the claim language. In the words of the district court, "for the effector 'to provide an isometric exercise,' and for the sensor to be 'responsive' to that isometric exercise force, the *effector* must be the 'object'" that significantly resists movement. A49 (emphasis in original).

### b.    The District Court's Construction Aligns With the Specification, Including the '982 Patent's Express Definition of "Isometric Exercise"

The district court's construction also aligns with the '982 patent's express definition of "isometric exercise." *See Phillips*, 415 F.3d at 1315 (written

description is "the single best guide to the meaning of a disputed term") (citation omitted).

"A patentee is free to be his own lexicographer" and define terms in the specification. *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. The district court applied this principle and adopted (with one clarification) the express definition of "isometric exercise" in the '982 patent. *See* A47. IA Labs does not and cannot fault the district court for relying on the patent's express definition.

The district court's construction is also consistent with the rest of the specification. In both embodiments, a user "engages in a combined isometric exercise and interaction with the software program by gripping at least one effector bar and applying a force to exert a strain on the bar." A191 (col. 10, lns. 47-55).



A2276

In the Figure 2 cockpit embodiment (shown above), the user grips the rigid effector bars and attempts to bend, twist, push or pull them.  A192 (col. 11, lns. 21-26).  Figure 1 works the same way, so the specification is consistent throughout:  the effector is the object that resists muscle effort and thereby provides isometric exercise.

The specification emphasizes this by explaining that "isometric exercise features" of the invention are "provided by effectors."  A193 (col. 14, lns. 40-51) ("Optionally, input devices may be provided … that provide [dynamic] exercise features in addition to the isometric exercise features *provided by effectors*.") (emphasis added).  The specification describes no embodiment where an object other than an effector provides isometric exercise.

Because the specification contains no example where an effector is not used to conduct the claimed isometric exercise, IA Labs points instead to "simple forms" of isometric exercise mentioned in the Background section of the patent: (a) attempting to pull apart tightly gripped hands; and (b) "isometric training" where a fighter jet pilot performs isometric abdominal contractions.  But those were not descriptions of the invention.  That exercise can be done without the invention's structure, and thus do not require "an effector," is irrelevant.

IA Labs points to the specifications discussion of "isometric training" by "fighter jet pilots," see A189 (col. 1, lns. 26-29), as an example of the user's body

being the "object" that significantly resists movement during isometric exercise. The district court properly rejected IA Labs' "fighter pilot" argument, observing that, unless an exercise "is provided by the effector and responded to by the sensor, it is not 'isometric exercise' within the limitations of claim 1." A51. In other words, "isometric exercise is only possible because of the force on the effector, such as the rigid steel bar described in both embodiments, and cannot be conducted without it." A64. That combination of elements is the claimed invention. A construction of "isometric exercise" allowing the user's body to be the resisting object is inconsistent with the invention.

### c.    IA Labs' Focus on Extrinsic Evidence is Misplaced

With the intrinsic evidence against it, IA Labs resorted to extrinsic evidence. Yet it is legal error to elevate extrinsic evidence over intrinsic. IA Labs' extrinsic evidence cannot save its claim construction argument.

Expert testimony on claim construction is unreliable. It "is generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318. While such testimony may provide "useful background" for claim construction, "assertions by experts as to the definition of a claim term are not useful to a court." *Id*. Where, as here, "the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to *no* weight." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

1576, 1583 (Fed. Cir. 1996) (emphasis added).  The district court applied these principles and correctly declined IA Labs' invitation to focus on experts.

The patent alone is sufficient to resolve any alleged ambiguity regarding "isometric exercise," especially when the specification defines the term.  To the extent that definition requires clarification, the specification provides ample description of isometric exercise in both the "Summary of the Invention" and the description of the preferred embodiments.  The District Court was right:  under these facts, the law requires a claim construction based on the patent documents, not expert testimony.

IA Labs ignores this, and devotes 7½ pages to the testimony of Dr. Drury and Dr. Phillips.  IA Labs relies on that testimony in a manner contrary to the intrinsic record and the law of claim construction.

IA Labs relies (at 31-33) on Dr. Drury's opinion that isometric exercise can generally include exercises using "bodyweight and gravity alone."  The district court recognized that isometric muscular contractions can exist outside the context of the invention where the "resisting object" is the user's body.  Yet exercise away from the invention is irrelevant.  As the district court explained, the '982 patent did not claim the user's body as the resisting object—it claimed "an effector" that provides isometric exercise.  IA Labs' emphasis on Dr. Drury's opinion misses the point:  isometric exercise in the claimed invention always involves an effector.

IA Labs also focuses (at 33-34) on Dr. Drury's testimony that upwardly-directed "ground reaction forces" are present during static body positions, such as the crouch of Figure 3.19 from the Enoka textbook. This point is neither controversial nor relevant. When a user stands on the Balance Board, her weight pushes down on the board and the bottoms of her feet feel the ground reaction force—the board pushing back. The presence of the ground reaction force is irrelevant to claim construction.

IA Labs' discussion (at 35-36) of Dr. Phillips' supplemental noninfringement opinion is similarly flawed. That report does not attempt to construe "isometric exercise." Although Nintendo disagrees with IA Labs' characterization of the supplemental report, the larger point is that the report is irrelevant to claim construction. And IA Labs does not explain why the supplemental report supports its claim construction. Regardless of what IA Labs is trying to say, the meaning of isometric exercise is unambiguous from the patent, so reliance on expert testimony is inappropriate.

### 3. The "Sensor" is Responsive to Forces Applied to Perform Isometric Exercise, Not Weight and Weight Shifting

Although IA Labs' Statement of the Issues does not identify the construction of "sensor" as an issue on appeal, IA Labs nevertheless raises the issue in its brief. In particular, IA Labs argues (38-39) that the district court erred by adding a "negative limitation," supposedly by holding that the sensors "*do not* respond to

forces not originating from an isometrically-contracted muscle …." (emphasis added).  IA Labs' is mistaken.

The district court did not impose a "negative limitation" on the sensor requirement.  Rather, the district court reasoned that the "sensor" of claim 1 "must be responsive to the force exerted by the user's isometrically exercised muscles against the effector."  A76.  The district court did not use negative language.  Instead, the district court used the positive language "must be responsive."  A76.  This language comes from the claims, which say the sensor must be "responsive to at least one force applied by said user to said effector to perform said isometric exercise."  A194 (claim 1); *see also* claim 9 (sensor must measure "a measurable deformation of said [effector] rod" resulting from a "force applied by the user to said effector").

IA Labs' sensor argument also depends on a partial quote of claim 1.  IA Labs' Br. at 39.  IA Labs quotes the language "at least one sensor coupled to said rod and responsive to at least one force applied by the user."  *Id*.  IA Labs leaves out the rest of the claim's clause, which adds "to said effector to perform said isometric exercise."  By omitting language, IA Labs ignores a central claim requirement:  the user's isometric force is applied "to said effector."  This omission allowed IA Labs to contend that the district court required a sensor detecting forces

from any isometric exercise.  *Id.*  The sensor, however, is not "responsive" to just *any* force.  Only muscle force applied to the effector qualifies.

IA Labs also misreads the district court's discussion of the "sensor."  The portion of the summary judgment Order cited by IA Labs stands for the uncontroversial proposition that a sensor must be responsive to isometric exercise.  This requirement is expressly stated in the claims.  Thus, if a sensor responds only to other kinds of force, such as weight, it does not perform the function of the "sensor" in the claims.

IA Labs' sensor argument overlooks key claim language and misreads the District Court's opinion.  This Court should affirm the District Court interpretation of "sensor."

## C.     The District Court's Fee Award was Appropriate Because IA Labs Filed and Maintained Objectively Baseless Claims of Infringement

IA Labs argues that it was reversible error to award Nintendo its fees for defending against a charge of infringing an invalid and now-disclaimed patent.  IA Labs contends that the district court did not perform a claim-by-claim, element-by-element analysis of the commercial embodiment to determine that the claims were invalid.  Yet IA Labs did not raise this argument in its opposition to the fee motion.  A2233-45.  IA Labs argued only that the Kilowatt products, which it conceded were publicly used and on sale before the critical date, lacked a single claim element:  "an inner support disposed within said hollow interior of said effector

device" (i.e., the "tube inside a tube" feature).  A2239.  The district court carefully

considered the issue and found clear and convincing evidence that the pre-critical-

date Kilowatt did indeed contain the "tube inside a tube" design.

This Court has traditionally applied a "clear error" standard to a district

court's determination that a case is "exceptional" under § 285.  *See, e.g.*, *Cybor*

*Corp. v. FAS Techs., Inc.,* 138 F. 3d 1448, 1459 (Fed. Cir. 1998)(en banc);

*Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, No. 2011-129, 2012

WL 6054758, at * 11 (Fed. Cir. Dec. 6, 2012) (Reyna, J., dissenting) (citing cases

setting forth clear error standard and noting:  "Even a cursory review of our cases

reveals that we have clearly set forth a deferential standard of review and we have

routinely communicated to litigants and lower courts that we will review all § 285

findings for clear error.  Here, the established precedent is especially wise, and

should not be disturbed.").  IA Labs has not come close to showing clear error.

But the fee award is appropriate even if the Court conducts a *de novo* review

regarding the "objective" prong as proposed by IA Labs (at 56).

### 1.    Fee Awards are Proper When a Patentee Brings an Objectively Baseless Infringement Claim in Bad Faith

"Absent litigation misconduct or misconduct in securing the patent,

sanctions under § 285 may be imposed against the patentee only if both (1) the

patentee brought the litigation in bad faith; and (2) the litigation is objectively

baseless."  *Eon-Net LP v. Flagstar Bancorp.*, 653 F.3d 1314, 1324 (Fed. Cir.

2011). Bad faith may be inferred where the patentee is "manifestly unreasonable in assessing infringement, while continuing to assert infringement in court." *Eltech Sys. Corp. v. PPG Indus., Inc.,* 903 F.2d 805, 811 (Fed. Cir. 1990) (affirming an award of attorney fees under § 285 for pursuing a baseless claim of infringement). "A frivolous infringement suit is one which the patentee knew or, on reasonable investigation, should have known was baseless." *Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1273-74 (Fed. Cir. 2004).

**2.    Overwhelming Evidence Supported the District Court's Findings that the '226 Patent was Invalid and that IA Labs' Principals Knew of the Facts Causing Invalidity**

The public use and on-sale activities were well known to IA Labs before it filed this lawsuit. Interaction's public demonstrations and offers to sell commercial embodiments of the '226 patent were numerous and notorious. These facts show IA Labs was objectively unreasonable in assessing its case, and acted in bad faith when it first asserted and then maintained claims of infringement.

Interaction aggressively engaged in activities to commercialize and generate public interest in its products. This included public demonstrations of a Kilowatt product embodying the '226 patent at multiple trade shows, including the 2004 CES show in Las Vegas and the 2004 SuperShow in Orlando, Florida. Interaction also offered the Kilowatt for sale on its web site and pre-sold the device to consumers and retail outlets. A1761; A1794-95; A1817-18; A1826-27. Many of

these activities, particularly the trade shows, were covered by the media, and information regarding these activities was circulated to millions of people. As IA Labs recognized when it disclaimed all claims of the patent, those activities rendered the '226 patent invalid under the public use and on-sale bars of 35 U.S.C. § 102(b).

IA Labs was on full notice of that invalidity. Greg Merril was Interaction's co-founder, President, and CEO. Because Interaction was a small company that had only a few employees, Mr. Merril knew of most, if not all, of the events producing the bars to patentability. Not only did Mr. Merril run Interaction day-to-day, but he was present at many of the public demonstrations, spoke with the media about those demonstrations, and was a named inventor on the '226 patent. A1450-52; A1802; A1859-60; A196. Although Interaction later transferred the '226 patent to IA Labs, Merril was one of IA Labs' two officers. A2103-04. The district court was fully entitled to impute the knowledge of Merril and Interaction to IA Labs. *See*, *e.g.*, *Hughes v. Novi Am., Inc.*, 724 F.2d 122, 124 (Fed. Cir. 1984) (affirming fee award where plaintiff Hughes was engaged in patent-barring sales and advertising of the patented product while an officer and employee of the prior patent owner).

IA Labs' assertion (at 55) that the district court lacked a full evidentiary record is wrong. The record demonstrated that the publicly displayed and on-sale

Kilowatt met all of the claim limitations.  It included:  (i) a vertical rod (effector) supporting a controller; (ii) a hollow interior of the rod containing a strain gauge sensor attached to an inner support; and (iii) a force applied to the exterior of the rod was transferred to the inner support for measurement by the sensor.  A1336-42. The district court carefully considered the issues based upon full and detailed briefing submitted by the parties.  *See* A85-93.  IA Labs made a strategic decision to focus on the "tube inside a tube" feature.  It did not challenge or present contrary evidence regarding other claim elements, and it cannot complain now that the record was inadequate.

### 3. The District Court Properly Considered and Rejected IA Labs' Only Argument for Validity:  That the Commercial Embodiment Did Not Practice the "Tube Inside A Tube" Claim Limitation

IA Labs contends (at 59-60) that the district court's fee decision must be reversed because the court did not "make 'specific findings' regarding whether the Kilowatt met all of the elements of the claims of the '226 patent."  IA Labs insists that the district court was required to provide specific findings on each claim element.  Yet IA Labs argued to the district court that only a single claim element (the "tube inside a tube" design) was missing from the Kilowatt.  A2239.  Indeed, even though IA Labs insists that specific findings on each claim element are required, its briefing here continues to focus on that single claim element.  On the merits, the district court was entitled to find that the Kilowatt, as publicly

demonstrated and offered for sale before the critical date, contained the "tube inside a tube" feature.

In arguing otherwise, IA Labs relies (at 64) on an undated, after-the-fact chronology and testimony by two of the named inventors on the '226 patent, Jason Grimm and Greg Merril.  A3344.  The chronology supposedly shows that Jeff Schott (another co-inventor) was hired in May 2004, and Mr. Grimm testified that the "tube in a tube" design was not developed until after Mr. Schott was hired. A2251.  That evidence was flawed.

First, IA Labs cannot avoid the effect of public-use and on sale bars by establishing a later date of conception through inventor testimony.  Inventor testimony about conception dates requires independent corroboration.  *See, Concordance Corp. v. Amazon.com, Inc.*, 658 F.3d 1330, 1334 (Fed. Cir. 2011) ("Because of a concern that inventors testifying in patent infringement cases would be tempted to remember facts favorable to their case by the lure of protecting their patent or defeating another's patent conception must be proven by corroborating evidence.").  IA Labs presented no independent corroboration.

Second, the district court was entitled to reject Mr. Grimm's testimony, because that testimony was contradicted by both witnesses and documentary evidence.  Interaction's chief engineer, Mr. Tsai, testified that the "tube inside a tube" design was developed well before Mr. Schott's purported hire date in May

2004 and was fully implemented by late 2003.  A1551-52; A1556-58; A1560.

Even more damning, Interaction's contemporaneous documents confirmed that the

"tube inside a tube" design existed before Mr. Schott's hire date. *See, e.g.*, A3319;

A3323; A3328; A3333; A9993.

Third, Mr. Grimm's testimony that the "tube in a tube design" was not

conceived until sometime after the January 2004 trade show (cited by IA Labs

at 64) proves nothing:  the critical date was May 20, 2004, and there was extensive

evidence of public-use and on-sale activity occurring between the January 2004

trade show and the critical date, May 20, 2004.

Finally, IA Labs points (at 64) to Mr. Merril's vague suggestion that

"significant design changes" were made after the public trade show

demonstrations, including changes to "the configuration of the … mechanical

structure," "configuration of the sensors," and "configuration of the electronics."

But none of these "changes" correspond to the claim limitations of the '226 patent,

and IA Labs does not attempt to argue otherwise.

### 4.    IA Labs' Contention that the District Court Ignored the Presumption of Validity is Wrong

IA Labs argues (at 60-61) that the district court shifted the burden of proving

validity to IA Labs and thus disregarded the presumption of validity.  Not so.

Nintendo's motion for fees presented extensive and detailed evidence

demonstrating that Interaction had publicly demonstrated and offered for sale an

embodiment of the '226 patent more than a year before filing the patent application.  A1336-1342.  In its opposition, IA Labs made numerous arguments contesting whether Nintendo was a "prevailing party" under § 285, A2234-37, but it did not argue that Nintendo had failed to present a prima facie case of invalidity or that Nintendo failed to overcome the presumption of validity.  IA Labs attempted instead to create an issue of fact on a single limitation, arguing that there was evidence suggesting that the commercial embodiment did not meet the "tube inside a tube" limitation, which it contended was the "essential teaching[ ] of the '226 patent."  A2239.  That argument was considered and properly rejected by the district court.

There is no support for IA Labs' argument that the district court disregarded the presumption of validity or shifted the burden of proof.  Moreover, the authority cited by IA Labs does not support overruling the district court.  *W.L. Gore & Assocs., Inc. v. Oak Materials Grp., Inc.*, 424 F. Supp. 700, 702-03 (D. Del. 1976) involved a disclaimed patent and a dismissed claim of infringement.  *Gore* considered whether the defendant had sufficient evidence to establish prima facie grounds for declaring the case exceptional, such that it would be permitted further discovery and an evidentiary hearing on the issue.  The defendant's fee argument was based on an assertion of inequitable conduct during prosecution of the patent and discovery of prior art during an earlier lawsuit on the same patent.  *Gore*, 424

F. Supp. at 705-08.  But the defendant acknowledged it had no evidence that the plaintiff had actual knowledge of the undisclosed references and the court found that the plaintiff could have maintained a good-faith belief in validity of the patent notwithstanding the later-discovered prior art.  *Id.* at 706, 709.  In this case, the district court found that the publicly demonstrated, on-sale Kilowatt "embodied the invention of the '226 patent," and that IA Labs "was aware of the on-sale activities," A89.  It also found that IA Labs' sole argument regarding a single missing limitation was "disingenuous" and that IA Labs several-month delay in dismissing its '226 claim was "evidence of bad faith."  A89.  Those findings were well-supported, and they fully justify the "exceptional case" finding.

## VII.   CONCLUSION

No reasonable jury could find infringement of the '982 patent, so the district court properly granted summary judgment.  The district court also properly construed the term "isometric exercise," providing an additional ground for non-infringement.  The district court's finding that the assertion of the '226 patent was exceptional is fully supported by the facts and the district court's careful analysis.  The district court's judgment should be affirmed in its entirety.

DATED:  January 18, 2013                    PERKINS COIE LLP


By: /s/ Jerry A. Riedinger
    Jerry A. Riedinger
    JRiedinger@perkinscoie.com
    C. Mark Kittredge
    Tyler C. Peterson
    Kirstin E. Larson

Attorneys for *Defendants-Appellees*
*Nintendo Co., Ltd. and*
*Nintendo of America Inc.*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,809 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Times New Roman type.

January 18, 2013

_____/s/ Jerry A. Riedinger_____
Jerry A. Riedinger
Principal Attorney for Defendants-Appellees

### CERTIFICATE OF SERVICE

I, Jerry A. Riedinger, certify that on January 18, 2013, I caused the **NON-CONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLEES NINTENDO CO., LTD. AND NINTENDO OF AMERICA INC.** to be filed with the Court, via the CM/ECF system causing notice of the filing to be served on the following counsel of record and registered CM/ECF users:

> Andrew G. DiNovo
> adinovo@dpelaw.com
> Adam G. Price
> Aprice@dpelaw.com
> Jay D. Ellwanger
> jellwanger@dpelaw.com
> Nicole E. Glauser
> nglauser@dpelaw.com
> Stefanie T. Scott
> sscott@dpelaw.com
> DiNovo Price Ellwanger & Hardy LLP
> 7000 N. MoPac Expressway, Suite 350
> Austin, TX  78731

Upon acceptance, an original and four copies of the **NON-CONFIDENTIAL BRIEF FOR DEFENDANTS-APPELLEES NINTENDO CO., LTD. AND NINTENDO OF AMERICA INC.** will be filed with the Court via UPS overnight courier as follows:

> Clerk of the United States Court of Appeals for the Federal Circuit
> Room 401
> 717 Madison Place, NW
> Washington, DC  20439

Two copies are also being mailed to counsel of record listed above.

January 18, 2013                     /s/ Jerry A. Riedinger
                                     Jerry A. Riedinger
                                     Principal Attorney for Defendants-Appellees